Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000473
26-DEC-2019
09:42 AM

NO. CAAP-16-0000473

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


TED'S WIRING SERVICE, LTD., Plaintiff-Counterclaim
Defendant/Appellee, v. DEPARTMENT OF TRANSPORTATION,
STATE OF HAWAI'I, Defendant-Counterclaimant/Appellant,
JOHN DOES 1-50 and DOE CORPORATIONS 1-50, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 13-1-1910-07)


MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Hiraoka, JJ.)

Defendant-Counterclaimant/Appellant Department of
Transportation, State of Hawai'i (DOT) appeals from a May 20,
2016 Circuit Court of the First Circuit (Circuit Court)[1] Judgment
(Judgment) awarding Plaintiff-Counterclaim Defendant/Appellee
Ted's Wiring Service, Ltd. (TWS) $112,151.47.

In this action brought by TWS for contract amounts
retained and unpaid for goods provided and services rendered to
DOT, the Circuit Court granted TWS's motion for summary judgment.
On appeal, DOT contends the Circuit Court erred by

(1)    finding as a matter of law that:

(A)    DOT accepted the Automated Vehicle Identification
system (AVI) proffered by TWS where no final acceptance letter
had been issued by the State as required by their contract;

(B)    DOT accepted the AVI where TWS admitted under oath
that the system had not been accepted;

---

[1]    The Honorable Jeannette H. Castagnetti presided.

(C)   TWS's Concept of Operations (COP) changed the requirements of the contract despite contract provisions that limited modifications to change orders;

(D)   TWS had complied with its COP where DOT's expert's report demonstrated failures to comply;

(E)   DOT had changed the time of performance of the contract in the absence of a change order; and

(2)   disregarding the contract's non-waiver provision.[2]

After careful review of the record on appeal and the relevant legal authorities, and giving due consideration to the issues raised and the arguments made by the parties, we vacate the Circuit Court's Judgment and remand for further proceedings.

DOT's arguments boil down to this:  The COP did not change the terms of the contract and even if it did, TWS did not comply with the terms as changed; and DOT did not accept TWS's performance and even if it did, under the contract, acceptance did not waive DOT's claims for damages for failure to fully perform.

1.   **The contract documents governing the project.**

The parties' agreement consists of three multi-part components:

(1)   **The Contract,** consisting of the "State of Hawaii Agreement for Goods or Services Based Upon Competitive Sealed Proposals," to which the "Scope of Services," "Time of Performance," "Compensation and Payment Schedule," "Surety Performance Bond," "Surety Labor and Material Bond," and "General Conditions" were attached;2

(2)   **The RFP,** consisting of the Request for Proposals for a certain project entitled "Design/Build Proposal Documents For Automatic Vehicle Identification System For Honolulu International Airport Project No. A01112-23" which included General Conditions, Special Provisions, Supplemental Special Provisions, Airports Division Supplement,  State Wage Rate Schedule, Article 10, Plan Sheets, Requirements of Chapter 104, HRS, Bid Price Proposal and various appendices; and

---

[2]     The DOT's Points of Error have been modified for clarity.

(3)   **The Proposal,** consisting of the "Proposal for Furnishing Labor and Materials Required for Automatic Vehicle Identification System Honolulu International Airport Project No. A01112-23 Honolulu, Oahu, Hawaii For the State of Hawaii Department of Transportation Airports Division" (June 1, 2000 Proposal) and the "Article 10 Requirements for Proposal for Automatic Vehicle Identification System for Honolulu International Airport Project No A01112-23" (Article 10 Proposal).[3]

The Contract specifically incorporates the RFP, the Proposal, and the General Conditions.  The RFP made the General Provisions applicable to the Project.  The General Provisions were also incorporated by reference in the Special Provisions, were modified by the Supplemental Special Provisions, and the Airport Division Supplement to Special Provisions.  Moreover, the Contract stated,

> The General Conditions and any Special Conditions are attached hereto and made a part of this Agreement.  In the event of a conflict between the General Conditions and the Special Conditions, the Special Conditions shall control. In the event of a conflict among the documents, the order of precedence shall be as follows:  (1) [Contract], including all attachments and addenda; (2) [RFP], including all attachments and addenda; and (3) Proposal.

In addition, the Scope of Services attached to the Contract provided that, if there was a conflict between the Scope of Services and the General Conditions, the General Conditions would govern, unless otherwise specified.

2.   **The operative law.**

This court reviews "the circuit court's grant or denial of summary judgment *de novo*."  Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citing Hawai'i Cmty. Fed. Credit Union v. Keka, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)). Accordingly,

---

[3]      TWS attached to its June 2, 2015 motion for summary judgment (June 2015 MSJ) only the June 1, 2000 Proposal.  However, the Scope of Services explicitly identifies the Article 10 Proposal as the proposal TWS submitted in response to the RFP.  The State maintained in its opposition to TWS's June 2015 MSJ that the June 1, 2000 Proposal, and the Article 10 Proposal formed TWS's bid.  The Article 10 Proposal bears TWS's letterhead, consists of approximately fifty-eight pages, but appears to be undated.

> [o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

Iddings v. Mee-Lee, 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996); see also Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c).[4]

On a motion for summary judgment, "[a] fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Crichfield v. Grand Wailea Co., 93 Hawai'i 477, 482-83, 6 P.3d 349, 354-55 (2000) (internal quotation marks omitted) (quoting Hulsman v. Hemmeter Dev. Corp., 65 Haw. 58, 61, 647 P.2d 713, 716 (1982)). "[A] 'genuine issue as to any material fact' . . . under a conflict in the affidavits as to a particular matter must be of such a nature that it would affect the result." Richards v. Midkiff, 48 Haw. 32, 39, 396 P.2d 49, 54 (1964).

In reviewing a trial court's grant or denial of a motion for summary judgment, the appellate court "must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion." Crichfield, 93 Hawai'i at 483, 6 P.3d at 355 (quoting Taylor v. Gov't Emps. Ins. Co, 90 Hawai'i 302, 306, 978 P.2d 740,744 (1999) (internal quotation marks, and brackets omitted). "[A]ny doubt concerning the propriety of granting the motion should be resolved in favor

---

[4]     HRCP Rule 56(c) provides, in relevant part:

**Rule 56.     SUMMARY JUDGMENT.**

        . . . .

        **(c) Motion and proceedings thereon . . . .** The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

of the non-moving party." <u>GECC Fin. Corp. v. Jaffarian</u>, 79
Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995).

> Similarly,

> [c]ourts will treat the documents submitted in support of a
> motion for summary judgment differently from those in
> opposition. Although they carefully scrutinize the
> materials submitted by the moving party to ensure compliance
> with the requirements of Rule 56(e), HRCP (1990), the courts
> are more indulgent towards the materials submitted by the
> non-moving party. This is because of the drastic nature of
> summary judgment proceedings, which should not become a
> substitute for existing methods of determining factual
> issues.

> Affidavits in support of a summary judgment motion are
> scrutinized to determine whether the facts they aver are
> admissible at trial and are made on the personal knowledge
> of the affiant. Also, ultimate or conclusory facts or
> conclusions of law are not to be utilized in a summary
> judgment affidavit.

<u>Miller v. Manuel</u>, 9 Haw. App. 56, 66, 828 P.2d 286, 292 (1991)
(citations omitted). "Once the movant has satisfied the initial
burden of showing that there is no genuine issue of material
fact, the opposing party must come forward, through affidavit or
other evidence, with specific facts showing that there is a
genuine issue of material fact." <u>Id.</u> at 65, 828 P.2d at 292. If
the non-moving party fails to meet this burden, the moving party
is entitled to summary judgment as a matter of law. <u>Hall v.
State</u>, 7 Haw. App. 274, 284, 756 P.2d 1048, 1055 (1988); <u>see also</u>
HRCP Rule 56(e).[5]

In deciding a motion for summary judgment, a circuit
court must keep in mind an important distinction:

> A judge ruling on a motion for summary judgment cannot
> summarily try the facts; his [or her] role is limited to
> applying the law to the facts that have been established by

---

[5] HRCP Rule 56(e) provides, in relevant part:

**Rule 56.     SUMMARY JUDGMENT.**

. . . .

**(e) Form of affidavits; further testimony; defense
required.** . . . When a motion for summary judgment is made
and supported as provided in this rule, an adverse party may
not rest upon the mere allegations or denials of the adverse
party's pleading, but the adverse party's response, by
affidavits or as otherwise provided in this rule, must set
forth specific facts showing that there is a genuine issue
for trial. If the adverse party does not so respond,
summary judgment, if appropriate, shall be entered against
the adverse party.

> the litigants' papers.  Therefore, a party moving for
> summary judgment is not entitled to a judgment merely
> because the facts he offers appear more plausible than those
> tendered in opposition or because it appears that the
> adversary is unlikely to prevail at trial.  This is true
> even though both parties move for summary judgment.
> Therefore, if the evidence presented on the motion is
> subject to conflicting interpretations, or reasonable
> [persons] might differ as to its significance, summary
> judgment is improper.

Kajiya v. Dep't of Water Supply, 2 Haw. App. 221, 224, 629 P.2d 635, 638-39 (1981) (quoting 10 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure: Civil § 2725 (1973)).

In general, "summary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues."  Miller, 9 Haw. App. at 65-66, 828 P.2d at 292 (citation and internal quotation marks omitted).

Here, TWS moved for summary judgment, asserting that it had satisfactorily performed its contractual obligations and was entitled to full payment therefor.[6]

> As a general rule, the construction and legal effect
> to be given a contract is a question of law freely
> reviewable by an appellate court.  The determination whether
> a contract is ambiguous is likewise a question of law that
> is freely reviewable on appeal.  These principles apply
> equally to appellate review of the construction and legal
> effect to be given a contractual agreement to arbitrate.

Brown v. KFC Nat'l Mgmt. Co., 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996) (citations and internal quotation marks omitted).

### 3.   Analysis of the contentions on appeal.

DOT argues that the Circuit Court erred when it determined, as a matter of law, that the COP changed the requirements of the contract.  This was error, DOT maintains, because the Contract could only be modified by a "change order."[7]

---

[6]   TWS also argued that it was entitled to judgment as to DOT's counterclaim for damages under the contract.  DOT has not challenged the Circuit Court's entry of judgment against it on its counterclaim on appeal.

[7]   A "change order" is defined, in Article 1.8 of the General Provisions, as

> A written order issued by the Director to the Contractor,
> covering changes in the plans, quantities or both, within
> the scope of the contract, establishing the basis of payment
> and time adjustments for the work affected by the changes.
> A change order is also a written order concerning the

(continued...)

This position is without merit.

DOT cites to no provision in any of the contractual documents which says changes to the contract must be done by change order. To the contrary, the General Conditions provide for Modifications of Agreement[8] as well as Change Orders. DOT

---

[7](...continued)
performance of work and/or the furnishing of materials involving extra work. Such extra work may be performed at agreed prices or on a force account basis as provided elsewhere in these specifications. A change order signed by all the parties to the contract is a supplemental agreement.

[8] Paragraph 19 of the General Conditions (Paragraph 19) provides, in pertinent part:

    a.    In writing. Any modification, alteration, amendment, charge, or extension of any term, provision, or condition of this Agreement permitted by this Agreement shall be made by written amendment to this Agreement, signed by the CONTRACTOR and the STATE, provided that change order shall be made in accordance with paragraph 20 herein.

    . . . .

    c.    Agency procurement officer. By a written order, at any time, and without notice to any surety, the Agency procurement officer, subject to mutual agreement of the parties to this Agreement and all appropriate adjustments, may make modifications within the general scope of this Agreement to include any one or more of the following:

    (A)    Drawings, designs, or specifications;

    (B)    Method or place of delivery;

    (C)    Description of services to be performed;

    (D)    Time of performance (i.e., hours of the day, days of the week, etc.);

    (E)    Place of performance of the services; or

    (F)    Other provisions of the Agreement accomplished by mutual action of the parties to the Agreement.

    . . . .

    g.    CPO approval. If a modification, alteration, amendment, change or extension of any term, provision or condition of this Agreement increases the amount payable to the CONTRACTOR by at least $25,000.00 or ten per cent (10%) of the initial Agreement price, whichever increase is higher, the prior approval of the CPO is required.

The "CPO" is referenced in the Contract as the "appropriate" Chief Procurement Officer.

argues, and TWS does not dispute, that there was only one Change Order issued with regard to this Contract. Thus, if a valid modification of the Contract's terms occurred, it needed to comply with Paragraph 19. As the Circuit Court did not rule that the COP so complied, it was error to conclude that the COP "as a matter of law" changed the terms of the Contract.

### a. **Evidence that the Contract was changed.**

The genesis of the COP appears to stem from "Section 4 AVI Central Software" attached to the Article 10 Proposal, which states: "The first step in the proposed approach is to work with the Airport to confirm the AVI system concept and operations . . . this step is expected to . . . and result in the production of a system concept report, which will guide the Prime Contractor's team(s) through the rest of the design and implementation process." The quoted language does not suggest a "modification" of the contract terms was being proposed, and the initial version of the COP--not included in the record on appeal--was rejected for not meeting all the Article 10 specifications by the procurement officer. In a May 17, 2002 letter to TWS discussing the COP, DOT specifically stated, "[a]s you know, we are concerned about the Concept of Operations not fully addressing the project specifications of the RFP." After citing an example, the letter goes on to state,

> [A]t minimum, all RFP specifications should be included in the Concept of Operations. Additionally, please note that any changes and/or adjustments to the RFP requires that an Amendment or Change Order to the Contract. (This information may be referenced in the General Conditions-Modifications of Agreement pages 12-14). Therefore, if there are any specifications that presently cannot be executed per the RFP; it is imperative that you inform us in writing with justification.

Subsequently, in a letter dated May 19, 2003, the new Manager of Oahu District Airports, Benjamin R. Schlapak, informed TWS that the COP dated April 11, 2003, "is approved as stated in concept." Viewing the evidence in the light most favorable to DOT, we cannot conclude, as a matter of law, that the act of accepting the COP superseded or modified the RFP specifications. We also cannot conclude that this evidence establishes that the COP constitutes a modification or amendment that meets the requirements of Paragraph 19 of the General Conditions.

TWS did not argue that the COP was a modification under the terms of Paragraph 19. TWS relies on the May 19, 2003 letter from DOT to TWS as evidence that the COP was approved by DOT. However, Paragraph 19 requires that a modification "be made by written amendment to this Agreement, signed by the contractor and the State." (Capitalization modified.) The COP was not signed by DOT. Moreover, the May 19, 2003 letter states that the April 11, 2003 COP was "approved as stated *in concept*", casting doubt about whether the details contained in the COP were also approved. Thus, there was a genuine issue of material fact as to whether the parties modified the terms of the Contract in the manner argued by TWS.

Finally, TWS submitted an October 19, 2009 email from Benton Ho, Facilities Engineer of the Airports Division for DOT, to Mike Kamaka of Bowers and Kubota Consulting, hired by DOT to manage the project after the death of Mr. Schlapak stating,

> It is apparent that the new system being installed by TWS is a vastly different system from the previously approved proposal. It would appear that we will need to have a formal submittal review process established. Although I concur on the differences of this new system, my expectations of the performance remains the same as provided by the original system (i.e. monitoring capabilities, and report generation).

This evidence also casts doubt upon whether the original specifications were modified.

Thus, we conclude there was a genuine issue of material fact regarding the validity of the COP as a modification of the Contract.

b. **Evidence that TWS complied with either the original or changed terms of the Contract.**

DOT disputed whether TWS complied with the COP. DOT argues the Circuit Court erred by finding TWS performed in compliance with the COP when its expert report demonstrated a failure to comply. The Circuit Court found the DOT expert report was based on the RFP, but that the COP modified those specifications. Having concluded that there is a genuine issue of material fact that the COP modified the Contract, we need not further address this point of error.

c.   **Change to the time for performance of the contract.**

DOT argues that similar to project specifications, the time of performance can only be amended by Change Order.  The Circuit Court found that DOT granted multiple extensions for TWS to perform.

As discussed above, changes to the Contract were not limited to Change Orders, and Attachment 2 to the Contract, Time of Performance, setting out the initial deadlines for the project, also provides that to the extent the General Conditions conflict with the Time of Performance, the former governs. Paragraph 19 specifically provides for adjustments of time for performance, stating, "If any modification increases or decreases the CONTRACTOR's cost of, or the time required for performance of any part of the work under this Agreement, an adjustment shall be made and this Agreement modified in writing accordingly."

The record contains numerous written statements that TWS had until a certain deadline to perform or Mr. Schlapak would refer the matter to the Director to declare TWS in default. These letters operated as written adjustments extending the time for performance.  Further, on June 23, 2009, the DOT made good on the threats to declare TWS in default and notified both TWS and Travelers.  Thereafter, on October 13, 2009, DOT and Travelers executed the Takeover Agreement.  The Takeover Agreement explicitly extended the time for performance stating "[DOT] agrees to extend the time for completion of said work to and including forty-five (45) calendar days from Notice to Proceed, which shall be issued after execution of this Takeover Agreement by both parties."  Looked at in the light most favorable to DOT, this evidence demonstrates there is no genuine issue of material fact as to the written agreement to extend the time for performance.

Thus, the Circuit Court did not err in finding the DOT extended the time for performance as a matter of law.

d.   **Evidence that the AVI System was "finally" accepted by DOT.**

The General Provisions provide:

1.23  **NOTICE OF FINAL ACCEPTANCE**--Written notice from the Director to the Contractor that the entire contract which has been completed in all respects in accordance with the plans, specifications, and any changes thereof previously authorized is accepted.

. . . .

5.12 ACCEPTANCE

. . . .

B.     **FINAL ACCEPTANCE**--Upon notice from the Contractor of completion of the entire project, the Director will make an inspection.  If the contract is found completed to the Director's satisfaction, such inspection shall constitute the final inspection and the Director will notify the Contractor in writing of his acceptance.

The Circuit Court held and TWS claims both on appeal and below that the February 17, 2010 letter constitutes final acceptance. On February 17, 2010, a letter was sent to Travelers in the name of the Director, Brennon T. Morioka, signed by Deputy Director Francis Paul Keeno (the February 17, 2010 letter), stating:

Subject: Automatic Vehicle Identification System for Honolulu International Airport, Project No. AO1112-23, Contract No. 46910 ("Project")

Dear [Travelers's Bond Claim Counsel]:

The software for the Automatic Vehicle Identification ("AVI") system developed by the completion contractor was installed, on February 2, 2010.  The software has been evaluated and was found to be functional, in accordance with the previously approved "Concept of Operations" dated May 19, 2003 [sic].  Comments regarding the system software have been submitted to the completion contractor for a response and appropriate action.

It is anticipated that more comments and clarifications will arise with regard to the software as we begin to implement and utilize the AVI system.  The operations manual provided by the completion contractor, although informative to an extent, does not provide enough detail to explain all of the capabilities and limitations of the software.  It is expected that the completion contractor shall fully support the Hawaii Department of Transportation ("HDOT") with the software during the operation and maintenance period.

As a result of the implemented software, the AVI System is accepted and HDOT shall assume use of the system.  The operation and maintenance phase of the project shall commence on February 15, 2010.  The completion contractor shall perform operation and maintenance as required by contract.

> As set forth in Article 10, B.1.m. the completion contractor shall provide training. Please have the completion contractor coordinate training for HDOT through our project managing consultant, Bowers + Kubota Consulting, Inc.
>
> As part of the contract, the completion contractor is required to furnish and install a total of 3,655 transponders (3,170 initial transponders + 485 additional transponders by change order) on selected ground transportation vehicles. It is requested that the completion contractor coordinate this task with the HDOT Airport Operations.
>
> If you have any questions, please call Mr. Benton Ho, HDOT Contracts Officer at (808) 587-2130.

The General Provisions unambiguously define what constitutes "final acceptance" under the contract. Interpreting the definition of final acceptance within the plain, ordinary, and accepted sense in common speech, the February 17, 2010 letter does not meet the definition of final acceptance, as provided in Article 1.23 of the General Provisions because it does not state "the entire contract [] has been completed in all respects[.]" To the contrary, the letter indicates that comments regarding the AVI had already been submitted for "appropriate action[,]" more comments and clarifications were anticipated, TWS was still expected to provide training, and TWS was still required to furnish and install an additional 3,655 transponders.

TWS argues on appeal that the February 17, 2010 letter qualifies as acceptance, citing to numerous DOT employee and agent depositions, including HRCP Rule 30(b)(6) witnesses. For example, TWS cites to the deposition of a Bowers and Kubota consultant charged with interpreting the contract documents and ensuring compliance that the "software worked as intended" and "met the requirements of the concept of operations." However, the consultant's interpretations of the contract terms are legal conclusions, based on their experience and expertise, not matters of fact. See AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 229 n.9 (3d Cir. 2009) (it is not clear that this issue should be resolved without a jury because the Federal Rules of Civil Procedure (FRCP) 30(b)(6) witness's testimony did not contain factual admissions or the intentions of the parties when forming the contract) (citing R & B Appliance Parts, Inc., v. Amana Co., 258 F.3d 783, 787 (8th Cir. 2001) (distinguishing

12

between matters of fact and conclusions of law in regard to FRCP Rule 30(b)(6) depositions)); see also Ellis v. Crockett, 51 Haw. 45, 60, 451 P.2d 814, 824 (1969) (because the HRCP are patterned after the FRCP, interpretation of the FRCP is highly persuasive with respect to the HRCP). Moreover, none of the deposition witnesses were present at the time of the formation of the Contract and could not testify to the parties' intentions in forming the contract. In any event, at best, their testimony contradicts the February 17, 2010 letter, leaving in dispute whether TWS satisfied the terms of the Contract.

Finally, DOT argues that the Circuit Court erred by finding as a matter of law that TWS did not judicially admit that the AVI system had not been accepted. This determination was based on an answer to an interrogatory that TWS did not turn over username and password information for the AVI server to DOT in part, because the system had not been accepted.[9] Again, like the other evidence regarding final acceptance, this answer presented the position of TWS and did not establish the final acceptance as a matter of undisputed fact. Furthermore, it is nonspecific as to date and provides more than one reason for withholding the login information. We therefore conclude that the Circuit Court

---

[9]     In TWS's responses to DOT's interrogatories filed with the Circuit Court on May 28, 2014, the pertinent interrogatory and answer read,

> 10. What is the username and password for the Automated Vehicle Identification Server you provided in the performance of the Contract?
>
> Answer:
>
> Ted's Wiring objects to this request on the grounds that it is vague and ambiguous. Subject to the foregoing objection and the Objections, Ted's Wiring responds as follows:
>
> Ted's Wiring previously offered to provide the DOT with the username and password for the server subject to three conditions, including the condition that the DOT provide assurance that Ted's Wiring would not be held liable for any subsequent problems. Ted's Wiring explained that, in the past, a DOT employee had entered the server and caused it to fail.
>
> Because neither this offer nor the system have been accepted, Ted's Wiring continues to hold the username and password in escrow as provided for in the Contract, including but not limited to, the Request for Proposals, Article 10 § B(1)(e).

did not err when it refused to determine that TWS made a binding admission as to the issue of final acceptance.

Taking all the evidence in the light most favorable to the non-moving party, the Circuit Court erred in deciding the February 17, 2010 letter constituted final acceptance.

e.   **Effect of the non-waiver provision of the contract.**

DOT contends the Circuit Court erred by not giving effect to the non-waiver provisions of the Contract. Specifically, that the non-waiver provision would permit DOT to recover even if there was final acceptance.  Given that there is a genuine issue of material fact whether DOT finally accepted the AVI System under the terms of the Contract, we decline to address this issue.

Based on the foregoing, the May 20, 2016 Judgment entered by the Circuit Court of the First Circuit is vacated and this case is remanded for proceedings not inconsistent with this memorandum opinion.

DATED:   Honolulu, Hawai'i, December 26, 2019.

On the briefs:

John H. Price and
Glenn I. Kimura,
Deputy Attorneys General,
for Defendant-Counterclaimant/
Appellant.

Keith Y. Yamada,
Kelly G. LaPorte, and
Christopher T. Goodin,
(Cades Schutte)
for Plaintiff-Counterclaim
Defendant/Appellee

Presiding Judge

Associate Judge

Associate Judge

14